## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| **UNITED STATES OF AMERICA** ) | |
| ) | **CRIMINAL ACTION** |
| **v.** ) | **NO.  4:19-40052-TSH** |
| ) | |
| **WILLIAM HOEY,** ) | |
| **Defendant.** ) | |
| _____ ) | |

### MEMORANDUM AND ORDER ON DEFENDANT'S AMENDED MOTION TO SUPPRESS EVIDENCE (Docket No. 55)

**September 14, 2021**

**HILLMAN, D.J.,**

The United States of America (the "Government") charged William Hoey with, *inter alia*, possession with intent to distribute 500 grams or more of cocaine, using and carrying a firearm in furtherance of a drug trafficking crime, money laundering, and filing a false tax return.  (Docket No. 71).  Hoey moves to suppress evidence obtained pursuant to a tracking warrant on a silver 2015 Audi Q7 registered to Hoey (the "Audi"); the search of the Audi; and the search of his residence (the "Residence") (Docket No. 48)  He further moves to suppress all statements he made to law enforcement agents at his Residence and at the Worcester DEA Office, as well as evidence related to funds in a Leominster Credit Union account seized as a result of a search warrant obtained based **in part** on the statements he seeks to suppress.  (Docket Nos. 48, 55).

For the following reasons, the amended motion to suppress is denied in part and granted in part.  The motion to suppress the GPS tracking warrant, the Audi and Residence search warrants, the Leominster Credit Union account search warrant, and the Defendant's statements to police at

1

the DEA Office are denied.  The motion to suppress the Defendant's statements to police at the Residence is granted.

## **Background**

### A. *GPS Tracking Warrant*

In January 2019, the DEA opened an investigation into Hoey's suspected drug trafficking. (Trainer Aff. ¶ 11, Docket No. 52-1).  DEA agents orchestrated a controlled buy on July 25-26, 2019, at which a confidential source ("CS-1")[1] arranged to meet Hoey using a mobile social media messaging application that erases past messages.  (¶ 12). The next day, agents observed Hoey arrive at the appointed meeting place driving the silver Audi. CS-1 entered the silver Audi with $1,850 in cash furnished by the DEA, and  Hoey took CS-1 on a short drive which was surveilled by agents. Hoey dropped CS-1 off and drove away, after which the CS-1 produced a clear, knotted bag containing a white substance that field tested positive for cocaine.  (¶¶ 13-14).  CS-1 informed agents that Hoey sold CS-1 the cocaine in exchange for the $1,850; the transaction was recorded by a hidden device which CS-1 carried. (¶ 14).  According to CS-1, Hoey had been CS-1's dealer for several years and had multiple customers.  (¶ 15).

In the GPS warrant application, Webster PD Officer Trainer added that, based on his State Police Academy and DEA Basics Narcotic School Training and his experience investigating drug trafficking as a task force officer with the DEA's Worcester High Intensity Drug Trafficking group, traffickers often used their cars to transport drugs and drug proceeds, meet with

---

[1] Officer Trainer disclosed CS-1's lengthy Massachusetts criminal history, including masked armed robbery and assault with a dangerous weapon, as well as open matters including animal cruelty, possession of a Class B substance, and driving with a suspended license, in his affidavit. (Docket No. 52-1 at 6, n.2).

coconspirators, or travel to financial institutions to deposit drug proceeds or transfer funds. (¶¶ 1-3, 9).  Using the controlled buy, CS-1's information, and his experience investigating drug trafficking as probable cause, Agent Trainer obtained a warrant to track the Audi with a GPS device for 45 days on August 12, 2019.  (Docket No. 52-1).

### B.  Audi and Residence Search and Seizure Warrants

On October 18, 2019, the DEA obtained search and seizure warrants for the Audi, Hoey's residence at 30 Shady Lane in Holden, and Hoey's cell phone based on a probable cause affidavit by DEA Agent Snow stating that at their direction CS-1 had made two additional controlled buys from Hoey on September 5, 2019 (CS-1 paid Hoey $3,700 for 100 grams of a substance that field tested positive for cocaine) and September 18, 2019 (CS-1 paid Hoey $7,400 for 200 grams of a substance that later tested positive for cocaine.[2]  (Docket No. 52-3).

During all three transactions, Hoey drove to a prearranged location to meet CS-1 in the Audi and drove away in the Audi.  CS-1 recorded all three sales.  On July 26 and September 5, the sale occurred in the Audi during a drive around the neighborhood.  On September 18, Hoey parked the Audi and entered CS-1's home to complete the sale.  (¶¶ 15, 19, 23-25).  Hoey drove the Audi from his residence in Holden to the meeting on September 5 and returned directly home to his residence on July 26 after the sale.  Agents admit they briefly lost sight of Hoey's vehicle in a rural area on his return trip but spotted the Audi in the open garage bay of the residence three minutes later (the affidavit does not say where Hoey drove after the September 5th sale).  (¶¶ 16, 19).  On September 18, Hoey drove the Audi from his girlfriend's home in West Boylston to the sale and returned directly to her home, rather than his residence in Holden, after the sale.  (¶¶ 23, 25).  The DEA kept records of the coded messages exchanged between Hoey and CS-1 to arrange the price

---

[2] Hoey is not challenging the legal validity of the warrant to search his cell phone.

and quantity of product for each sale, which include coded language that Agent Snow claims is indicative of drug trafficking based on his experience investigating narcotics cases. (¶¶ 20-22).

Agent Snow also stated that based upon his expertise, drug traffickers often keep indicia, paraphernalia, or other equipment associated with drug trafficking in their residences, including records, sales ledgers, packing materials, scales, weapons, and large amounts of currency in their residences or vehicles. (¶¶ 6-10). Agent Snow also disclosed CS-1's criminal record and that CS-1 had been paid $1,200 in compensation for his assistance with the Hoey investigation. (¶ 11, n. 2).

Law enforcement executed the search and seizure warrants for the Audi and Hoey's Residence on October 22, 2019 based on information that Hoey planned to sell a large quantity of cocaine on that day. At approximately 9:00 or 9:15 am, a uniformed Massachusetts State Trooper pulled Hoey's Audi over near a ramp on Highway 290 in Worcester and immediately ordered Hoey out of the vehicle. Approximately one minute later, DEA Agent Snow arrived on scene, dressed in plainclothes. Agent Snow, the trooper who stopped the Audi, and Task Force Officer Vitale (also in plainclothes) spoke with Hoey, who was ordered to stand on the passenger side of the Audi. Additional police cars were situated further up the ramp, directing traffic; together there were 3-4 police vehicles and 7-8 law enforcement officers at the scene.

Responding to Agent Snow's questions about whether the vehicle contained any narcotics or weapons or concealed spaces, Hoey told officers there were narcotics behind the driver's seat and a firearm in the center console—officers found 500 grams of cocaine and a loaded gun as Hoey had indicated[3] —as well as a "hide" under the passenger seat, which he showed them how

---

[3] Agent Snow testified that he knew that Hoey had a valid license to carry a concealed firearm before the traffic stop.

to open.  (¶ 1).  Agent Snow told Hoey that the police had a warrant to search his vehicle and Residence and asked if Hoey would consent to both searches to "expedite" the process.  (¶ 2).  He explained that if Hoey did not consent, the police would conduct a "tedious, room by room search" of the Residence. He also advised Hoey that in his experience cooperation with law enforcement could mean some consideration in sentencing, if he were charged with a crime, but that there were "no promises or guarantees" they could make to Hoey.  (*Id.*)  However, he did not make any promises that if Hoey consented to the searches or otherwise cooperated he would not be charged or receive leniency.  Hoey framed Agent Snow's statement differently, claiming that the officers told him if he cooperated it "would be helpful to my case and would have an effect on whether I would be held on bail."  (Hoey Aff. ¶ 20, Docket No. 49).  Hoey said he understood and agreed to the searches.  (DEA Interview Rep. ¶ 2).

The stop and questioning took approximately 30 to 45 minutes, and at no point did any officer brandish a weapon at Hoey.  The tone of conversation remained even, with Hoey appearing to be healthy and of sound mind.

At approximately 10:00 am, after the contraband in the Audi was discovered and Hoey had verbally consented to the searches, an officer handcuffed Hoey and placed him in the front seat of Agent Snow's car, telling Hoey that he was being restrained for officer safety because a loaded gun had been found in his car.  The Audi was left on the roadside, towed to the DEA garage, and searched.

During the 20-minute drive to Hoey's house with Agent Snow and TFO Pavia, Hoey asked "what are my rights?" Agent Snow responded that Hoey was not under arrest, that he could stop speaking with officers at any time, and if he wanted to contact an attorney the police would facilitate that (Hoey's cell phone was part of the search warrant and may have been seized during

the stop, though this was not detailed in the DEA Report or Agent Snow's testimony).  (¶ 3).  Hoey was not told that he was free to leave.

Once they arrived at the Residence, Hoey asked the officers to pull into his garage and opened the garage door using an application on his cell phone.  Within a few minutes of arriving, Hoey was unhandcuffed. He signed a DEA Consent to Search Form consenting to the search of the Residence and the Audi in the garage, witnessed by TFO Vitale and Agent Snow.  (Docket No. 52-5).  Additional police cars carrying about 5-6 police arrived at the Residence, bringing the total number of officers to approximately 7-8.

They entered the house and conducted a directed search, prompted by Hoey's answers to Agent Snow's questions about the location of contraband.  (DEA Interview Rep. ¶  4).  Hoey was unhandcuffed, but the search was performed in what Agent Snow testified was a "controlled environment"—Hoey was free to move but was accompanied by 4-5 officers and was not allowed to "dash into rooms" or open doors or closets.  Hoey told Agent Snow there was a safe in the basement with cocaine and another gun, provided a key to the closet with the safe and the safe combination, where officers found more cocaine and another gun, as well as a money counter and other paraphernalia associated with narcotics trafficking.  (¶ 4).  Hoey also told them there was a third gun and financial documents on the second floor; rather than going upstairs himself, officers retrieved those items, as well as U.S. currency.  (¶ 4).

The directed search over, Agent Snow and two officers continued questioning Hoey in the kitchen.  Agent Snow, standing by the sink, led the questioning while Hoey answered from across a kitchen island, a short distance away.  Both remained standing.  For the second time, Hoey asked the officers "what are my rights?" Agent Snow did not administer *Miranda*.  Instead, he told Hoey that he was not under arrest and that the officers were having "a consensual conversation with

6

him" that he could end at any time, and reiterated that Hoey could speak to an attorney if he requested.  (¶ 5).  Hoey was not told that he was "free to leave."

Hoey continued to answer questions in the kitchen for about 2 hours, telling Agent Snow that when he was stopped, he had been heading to Walmart to purchase an airtight container to store the cocaine they had found in the Audi.  (¶ 6).  Officers asked about the items found in the basement, one of the cell phones found in the Audi, and his drug customers.  (¶ 7).  At length, Hoey provided more incriminating information, including that he planned to sell the 500 grams of cocaine in his car, details about his supplier and how they communicated and transacted, the length of their relationship, payments, and his use of the messaging application "Wickr" to covertly arrange drug sales.  (¶¶ 7-9).

The tone of the conversation remained calm.  There was a lengthy discussion in which Agent Snow suggested that Hoey could cooperate with police by arranging a drug deal in the next few days; Agent Snow testified that this idea was explored and abandoned because Hoey provided the name of a potential target for the sale but could not successfully contact them on Wickr, leading him to believe that there was "0 validity" in Hoey's information. On cross examination, Agent Snow admitted that he told Hoey that if he cooperated, he would "have an opportunity to continue to cooperate," and that if he was taken into custody it might be some time before trial.

At approximately 12:30 pm or 1:00 pm, Hoey's wife arrived home and, surprised by the police presence, became upset.  (¶ 10).   Agent Snow suggested that Hoey continue the interview at the DEA Office in Worcester, and Hoey agreed.  (¶ *Id*.).  Agent Snow drove Hoey alone from the Residence to the DEA Office.  (¶ 10).  Hoey claims he was re-handcuffed for the trip; Agent Snow testified that Hoey was not handcuffed.  (¶ 10).

*C.  Custodial Statements*

At the DEA Office, 2-3 officers, led by Agent Snow, continued to question Hoey for several hours until about 6:00 pm.  Per Agent Snow, Hoey expressed a wish that the interview could have started at the DEA Office because "he felt much more at ease" there.  (¶ 10).  Within minutes of Hoey's arrival, he was again advised that he was free to stop speaking to the officers at any time.  (¶ 10).  He was not read his *Miranda* rights.   Unlike his inquiry about his rights on the drive from the traffic stop to his home and in his kitchen, this time he was told that he was free to leave.  (¶ 10).  The entrance to the DEA Office was locked, but the interview room where Hoey was questioned was not locked, and anyone inside the office could leave without a key.  Agent Snow testified that Hoey was offered water but did not recall whether he ever used the bathroom.  There was no evidence that Hoey ever attempted to leave.

Officers questioned Hoey about the identities of his customers; Hoey provided five names that officers recognized as aliases and information about how he met his source and started trafficking three years earlier.  (¶ 11).  Hoey also told officers that he typically purchases 1-2 kilograms of cocaine per month, described his other sources of income, and explained that had put the gun in his Audi because he was apprehensive about a deal to sell the 500 grams of cocaine found in the Audi.  (¶¶ 12-14).

 At some point, officers learned that Hoey's wife had called with an attorney's name and contact information.  (¶ 15).  Either Sergeant Marollo or Agent Snow told Hoey this information and offered to give Hoey the lawyer's name and information, and also reminded Hoey that he was still speaking with the officers by his own choice.  (¶ 15).   Hoey responded that he understood that he was free to leave at any point and declined to contact his attorney.  (¶ 15).

The questioning continued another 30 or 45 minutes.  Hoey told officers that the second Samsung phone they had discovered in the Audi had been left behind during his last meeting with

the replacement supplier.  (¶ 16).  Hoey began providing more inconsistent statements and the the interview deteriorated, with Agent Snow calling Hoey a liar.

At about 6:00 pm, officers decided to end the interview and asked Hoey again if he wanted to contact his attorney.  (¶ 17).  By this point, their uninterrupted interaction with Hoey had lasted approximately nine hours.  They left the room while Hoey called and spoke with his attorney.  (¶ 17).  After the call concluded, they reentered the room and Hoey, "now under the presumption that he was not free to leave," asked them "what changed."  (¶ 17).  Hoey was then handcuffed and formally arrested.  (¶ 17).

### D.  Credit Union Forfeiture and Seizure Warrant

On April 1, 2020, the DEA obtained a forfeiture warrant to seize all funds in an account at Leominster Credit Union in Hoey's father's name.  (Docket No. 62-1).

According to Agent Snow's Affidavit, on October 24, 2019 (two days after the search of his residence), Hoey withdrew more than $100,000 in cash from his TD Bank account and purchased a TD Bank Official Check (Check 3451-7) for $87,180.82 made payable to his father.  (¶ 17).  The check was not cashed or deposited for five months.  (¶ 18).  On March 24, 2020, Hoey voided Check 3451-7, then used the funds to request a new official check in the same amount (Check 5594-3), also made payable to his father.  (¶ 18).  That day, Check 5594-3 was deposited into his father's bank account at Leominster Credit Union ending in 8548.  (¶ 18).  Hoey's father opened that account one week after Hoey's arrest in October 2019.  (¶ 44).

Per Agent Snow, there was probable cause to believe that more than $10,000 of the money in the 8548 account was traceable to Hoey's alleged drug trafficking (because tax information shows that Hoey had no other source of income that large), so all the funds in the 8548 account were subject to seizure and forfeiture under 18 U.S.C. §§ 1956, 1957.  Between February 2016

and October 2019, Hoey deposited approximately $131,000 in cash into his checking account at Santander Bank. (¶ 31). Bank records show that Hoey routinely shuffled money between multiple accounts at multiple banks, including the Leominster Credit Union account under his father's name, which Agent Snow stated that based upon his experience is consistent with layering, a financial practice designed to obscure illicit funds. (¶ 46). He then transferred those funds to various other banks, including the TD Bank account from which he purchased Checks 3451-7 and 5594-3. (¶¶ 35-37).

Some of the information in the Affidavit to substantiate the amount of Hoey's deposits which constituted illegal drug proceeds was obtained from Hoey's interview statements to Agent Snow on October 22. (¶ 4, 24). Much of the information tracing Hoey's transfers and check purchases was obtained directly from financial institutions. (¶¶ 17-18). However, Agent Snow estimated the amount of cash in Hoey's accounts which constituted seizeable illegal drug proceeds by comparing Hoey's legitimate income to the amount of income he admitted he had earned selling cocaine during the October 22 interview. (¶ 25).

Based on Hoey's statements, Agent Snow estimated that Hoey profited between $4,000 and $5,000 per kilogram of cocaine sold; based on the volume of cocaine Hoey admitted to selling over the prior three years, Hoey's annual income from drug sources in 2016-2016 fell between $96,000 and $120,000. (*Id*.)

Agent Snow obtained Hoey's tax returns for 2016-2018 from the IRS pursuant to a court order and confirmed that Hoey had reported much less income than what was deposited in his various financial accounts: $17,765 in 2016; $ 16,325 in 2017; and $20,165 plus $ 5,550 from real estate investments in 2018. (¶ 28). Despite this limited income stream, Hoey had deposited approximately $131,000 of suspected drug proceeds in 63 deposits in a Santander Bank account from February 2016 to October 2019, which corresponds to the time period that he told officers he began selling cocaine. (¶ 29).

The magistrate judge agreed that the pattern of transactions in Account 8548 constituted probable cause that Hoey was using the account to illegally launder his drug proceeds, and that the money in that account was fairly traceable to illegal activity.  The warrant issued.

### Discussion

#### A.   GPS Tracking Warrant

The Fourth Amendment protects individuals against unreasonable government searches and seizures.  Unless a specific exception applies, in most cases law enforcement needs a valid warrant based on probable cause before they can search any area where a defendant enjoys a reasonable expectation of privacy.  *Bilda v. McCleod*, 211 F.3d 166, 171 (1st Cir. 2010).

"A search warrant application must demonstrate probable cause to believe that: 1) a crime has been committed, and 2) enumerated evidence of the offense will be found at the place to be searched—the so-called nexus element."  *United States v. Hicks*, 575 F.3d 130, 136 (1st Cir. 2009) (citations and internal quotation marks omitted).  "Probable cause exists when there is a 'fair probability that contraband or evidence of a crime will be found at a particular place.'"  *United States v. Torres-Rosario*, 588 F. Supp. 2d 128, 131 (D. Mass. 2008) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

The task of an issuing magistrate is to make a practical common-sense decision whether, taking into consideration all of the circumstances as summarized in the affidavit, there is a fair probability that evidence or contraband will be located at a particular place. *United States v. White,* 766 F.2d 22, 23 (1st Cir. 1985).  The reviewing court must "give due weight to the inferences drawn from [the facts presented by the affiant] by resident judges and local law enforcement officers." *Ornelas v. United States*, 517 U.S. 690, 699 (1996).  A finding of probable

cause will be reversed only if there was "no 'substantial basis'" for concluding that probable cause existed." *Ribeiro*, 397 F.3d at 48.

Hoey argues that the warrant to attach a GPS device to and track his Audi was constitutionally deficient because a single controlled buy, information provided by one informant, and reliance on Agent Trainer's experience investigating drug trafficking were not sufficient facts to constitute probable cause that the Audi was being used in a criminal enterprise or that tracking the Audi's movements would result in information related to criminal activity.

The Court disagrees and notes that Hoey has not cited to any case law suggesting that a single controlled buy is insufficient to support probable cause for a tracking warrant on the vehicle used in the drug sale.  Rather, the First Circuit has held that a single controlled buy does not establish *per se* probable cause for a search warrant.  *U.S. v. Khounsavanh*, 113 F.3d 279, 285 (1st Cir. 1997).  In fact, probable cause to search a place can established on the basis of one controlled buy and credible, first-hand information provided by an informant about the defendant's trafficking.  *U.S. v. Garcia*, 983 F.2d 1160, 1166-67 (1st Cir. 1993) (affirming that one controlled buy between two defendants and an informant where the informant had also provided credible information that he knew the defendants were selling cocaine in their apartment constituted probable cause to search the apartment where the controlled buy took place).

Here, there was substantial evidence that a crime was committed: officers arranged a controlled buy at which CS-1 purchased $1,850 worth of cocaine from Hoey.  The sale was recorded and surveilled, and officers took precautions to ensure there was no other source for CS-1 to procure the product he claimed he purchased from Hoey. Another indication of illegal

activity was that Hoey and CS-1 arranged the entire sale over a messaging app which erases records of communications between parties.

The Trainer Affidavit did not establish CS-1's credibility based on his prior cooperation; it also failed to note that CS-1 may have been compensated for his cooperation (the Snow Affidavit used to obtain the search warrants two months later noted that CS-1 had been paid $1,200 for his assistance). However, "an informant's tip can establish probable cause even though the affidavit does not contain information about the informant's past reliability." *U.S. v. Greenburg*, 410 F.3d 63, 67 (1st Cir. 2003). Here, CS-1's tip that Hoey had dealt CS-1 cocaine for a number of years was corroborated by CS-1's easy and successful arrangement of the large July 26 controlled buy; CS-1 knew how to contact Hoey and Hoey agreed to sell to CS-1.

Furthermore, there was a concrete nexus to the Audi: Hoey drove the Audi to meet CS-1, picked up CS-1 and took CS-1 on a short drive, sold the cocaine to CS-1 inside the Audi, then departed the scene of the sale in the Audi. Because agents surveilled Hoey and Hoey did not make any stops during the drive from his Residence to the sale, he must have kept the cocaine sold to CS-1 in the Audi rather than at the point of sale, meaning the Audi was used to transport the narcotics to the sale and to transport the proceeds from the sale away from the point of sale.

If this had been Hoey's first or only sale, then perhaps the magistrate might not have had fair reason to expect that tracking the Audi's movements might yield further evidence of narcotics trafficking or of the July 26 sale. But CS-1 told the police that Hoey had sold him cocaine for a number of years; that was corroborated when CS-1 was easily able to arrange a $1,850 sale to Hoey. Hoey's willingness to sell such a large quantity of cocaine to CS-1 indicates that he had likely sold controlled substance to CS-1 before and that he was an experienced dealer. Because agents had reason to believe that Hoey was a serial trafficker and

had witnessed him use the Audi to conduct a drug sale on July 26, there was probable cause to believe that tracking the Audi's movements would provide further evidence of Hoey's illegal activity.  It was appropriate for the court to consider Agent Trainer's statements based upon his four years working as a Task Force Officer on the DEA's High Intensity Drug Trafficking Area group that drug traffickers often use vehicles to transport drugs and drug proceeds and meet with suppliers and customers as support for the nexus requirement, though his expertise alone would have been insufficient without the evidence of the Audi's use in the July 26 controlled buy and CS-1's corroborated tip that Hoey was a serial drug trafficker.

Because I find that there was probable cause for the warrant (and all the other warrants at issue), the evidence obtained through GPS tracking will not be suppressed and there is no need to reach Hoey's alternative argument regarding the application of the good faith exception to the warrant requirement.  *See U.S. v. Hicks*, 575 F.3d 130, 137 n.1 (1st Cir. 2009).

### B.  Audi Search Warrant

As a preliminary matter, Hoey argues that the probable cause affidavit for the Audi search warrant was infected because some of the facts used to tie the Audi to Hoey's illegal activity relied on the GPS tracking data, which was illegally obtained.  Because I have affirmed the constitutionality of the GPS tracking warrant, this objection fails.

The police established additional facts supporting illegal activity and establishing a nexus between the Audi and Hoey's illegal activity than the facts which were available when it applied for the GPS Tracking Warrant, which I have held passed constitutional muster.  In the interim two months, agents conducted two additional controlled buys from Hoey using CS-1 on September 5, 2019 and September 18, 2019.   For both buys, as with the July 26 buy, Hoey drove to the site of the sale in the Audi and departed in the Audi.  On September 5, 2019, he again

conducted the sale inside the Audi during a short drive around the neighborhood with CS-1, which CS-1 surreptitiously recorded.  Again, agents took precautions to check CS-1 for cocaine before the arranged buy to ensure that any product he turned over after the buy could only have come from Hoey.  On September 19, 2019, rather than conduct the sale during a short drive around the neighborhood, Hoey drove in the Audi to CS-1's residence, parked, and entered CS-1's house to conduct the sale inside.  Nonetheless, the use of the Audi to transport cocaine on three separate occasions over three months establishes a clear pattern and fair probability that the Audi had been used to traffic controlled substances and that there was a fair probability it might contain evidence of that crime.

### C.  Residence Search Warrant

Hoey argues that the information in the application to search his home was too stale to constitute probable cause and that there was no sufficient nexus between the alleged drug trafficking and his residence.

Whether information in an affidavit is stale depends on "the nature of the information, the nature and characteristics of the suspected criminal activity, and the likely endurance of the information" rather than "counting the number of days that have lapsed."  *U.S. v. Morales-Aldahondo*, 524 F.3d 115, 119 (1st Cir. 2008) (denying motion to suppress evidence in child pornography case where more than three years lapsed between date defendant allegedly downloaded obscene material and the warrant application based on police testimony that individuals who download child pornography digitally store and often keep the material for years).  Here, agents witnessed Hoey leave his residence and drive to the cocaine sales on July 26 and September 5 (he returned directly home after the July 26 sale, and no information was

provided about September 5); they applied for the search warrant on October 19, 2019, six weeks later.

Hoey argues that the targeted items the police sought at the residence to prove Hoey's narcotics trafficking are all transient and could be easily moved within six weeks. Furthermore, Hoey adds that the fact that he travelled from his girlfriend's residence in West Boylston to the third sale on September 18 could indicate that he had moved his operation there, undercutting the nexus between his own residence and the alleged trafficking. Furthermore, CS-1 never provided law enforcement any information tying Hoey's home to the alleged trafficking. In short, there was no nexus evidence between the alleged trafficking and Hoey's residence beyond the two controlled buys on July 26 and September 5 and Agent Snow's professional opinion that narcotics traffickers often keep evidence of their illegal activities in their homes.

I find that the intervening six weeks between the September sale and the October warrant application did not render the information stale and that the affidavit establishes a sufficient nexus between Hoey's alleged trafficking and his home.

The First Circuit has affirmed search warrants based on even older evidence of drug trafficking. In *Feliz*, the drug sales described in the affidavit took place three months before the issuance of the warrant because the confidential informant's corroborated statements that he had purchased drugs from the defendant for years showed that the agents reasonably believed that the defendant's drug trafficking "was of a continuous and ongoing nature." *U.S. v. Feliz*, 182 F. 3d 82, 87 (1st Cir. 1999). As in *Feliz*, agents had reason to believe that Hoey's drug trafficking was continuous and ongoing based on CS-1's corroborated statements and that during their nine-month investigation agents never saw Hoey go to a place of employment or conduct activities that showed he made a living "flipping houses," as CS-1 stated, or by any legal means.

Though the information is not stale, whether it adequately establishes a nexus requires closer examination.  The First Circuit does not automatically permit the search of defendant's home when he has engaged in drug activity and has "expressed skepticism that probable cause can be established by the combination of the fact that a defendant sells drugs and general information from police officers that drug dealers tend to store evidence in their homes." *United States v. Bain*, 874 F.3d 1, 23-24 (1st Cir. 2017) (citation omitted), *cert. denied*, ––– U.S. ––––, 138 S. Ct. 1593, 200 L.Ed.2d 780 (2018).  "Accordingly, we have found that "generalized observations" of this type should be "combined with specific observations," or facts "connecting the drug dealing to the home" to permit an inference of nexus to a defendant's residence. Examples of such "specific observations" include evidence that drug distribution "was being organized from [the defendant's] residence," *United States v. Keene*, 341 F.3d 78, 82 (1st Cir. 2003), that the defendant used his home as a communications hub for drug activity, *United States v. Rivera*, 825 F.3d 59, 64-65 (1st Cir. 2016), or that the defendant "move[d] back and forth from his residence in relation to drug transactions," *Ribeiro*, 397 F.3d at 51." *United States v. Roman*, 942 F.3d 43, 51–52 (1st Cir. 2019) (internal citations omitted).

The First Circuit "has repeatedly found, however, that when a defendant sells drugs outside his home, it is reasonable to conclude that there is evidence of his drug dealing activity in the home, particularly when the defendant is observed leaving the home immediately prior to selling drugs." *U.S. v. Barnes*, 492 F.3d 33, 37 (1st Cir. 2007).  Here, Hoey returned to the Residence immediately after the July 26 sale and was seen leaving the Residence immediately prior to the July 26 and September 5 sales.  This shows a fair probability that he might be keeping the proceeds of his sales or the actual narcotics at his home, especially given that he did not make any stops on the way to the September 5 sale, and furnished drugs to CS-1 on that

occasion.  As established above, these sales were not stale when agents applied for the warrant.

Additionally, the magistrate "was entitled to accord some weight" to Agent Snow's professional

opinion "regarding the habits of drug traffickers with regard to retention of drug trafficking

records and proceeds" at their homes.  *See Feliz* at 87.  Between Agent Snow's opinion, the two

controlled buys, and the evidence suggesting that Hoey's trafficking was ongoing and

continuous, there was probable cause to issue the search warrant for Hoey's home.

### D.  Statements to Law Enforcement

The Fifth Amendment establishes a criminal defendant's right against self-incrimination.

To protect that right, "*Miranda* warnings must be given before a suspect is subjected to custodial

interrogation."  *U.S. v. Ventura*, 85 F.3d 708, 710 (1st Cir. 1996).  "The custodial interrogation

inquiry necessarily demands determination of its two subsidiary components: 1) custody and 2)

interrogation."  *Id*.

Hoey seeks to suppress his statements to agents at his home and at the DEA Office.  Both

parties agree that Hoey was never read his *Miranda* rights and that the agents' questions

constituted interrogation under *Rhode Island v. Innis*, 446 U.S. 291 (1980); they disagree about

whether Hoey was in custody, which is required to trigger *Miranda*.  Hoey argues that he was in

custody from the moment of the traffic stop on October 22; the Government contends that Hoey

was not custody at any point until he was formally arrested at the DEA Office.

To determine whether a defendant was in custody when there was no formal arrest, the

"ultimate inquiry is whether there was a 'formal arrest or restraint on freedom of movement of

the degree associated with a formal arrest'" when reviewing the totality of the circumstances and

whether a reasonable person under those circumstances would have felt free to leave.  *Id*. (citing

*Stansbury v. California*, 511 U.S. 318 (1994)).  Factors to consider include "whether the suspect

was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." *U.S. v. Masse*, 816 F.2d 805, 809 (1st Cir. 1987).

    1.  <u>Residence Statements</u>

       I disagree with Hoey's assessment that Hoey was in custody once his car was stopped. The "ultimate inquiry" distinguishing between an investigatory stop and a de facto arrest is whether there was "a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest," which requires "examin[ing] all the circumstances surrounding the interrogation." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995); *United States v. Ventura*, 85 F.3d 708, 710 (1st Cir. 1996). Under the standard established by *U.S v. Trueber*, a vehicle stop on a public street does not become custodial even where a defendant suspected of drug trafficking is told to step out of the vehicle, is patted down, and multiple officers are present but only a small number are in proximity to the defendant, so long as the officer performs an investigation that is "likely to confirm or dispel their suspicions quickly." 238 F.3d 79, 94 (1st Cir. 2001) (citing *U.S. v. Sharpe*, 470 U.S. 682, 686 (1985). Even if the officer making the stop intends to arrest the person being detained, there is no *de facto* arrest and no requirement to issue Miranda warnings from the outset. *Id*. at 92 (the district court's conjecture that the agents who made the stop were not going to "let [Treuber] go anywhere" was irrelevant to the validity of the stop because it concerned the subjective intent of the agents and had no bearing on police conduct).

       As in *Trueber*, as many as 7-8 officers were present at the scene and Hoey was ordered to step out of his car, but only three officers participated in questioning Hoey and he was not physically restrained. The total length of the stop—30 to 45 minutes—was longer than *Trueber*,

but it occurred in neutral surroundings, on a public road.  The officers limited their questions to those needed to resolve their suspicions about whether Hoey had cocaine in the car.  Agent Snow also informed Hoey that he had warrants to search Hoey's home and residence and asked for consent to search, but that set of questions did transform the stop into a de facto arrest absent other police conduct.

However, I agree that Hoey's statements at his Residence should be suppressed.  Applying the four *Masse* factors, I find that Hoey was in custody during the search of the Residence and his subsequent interrogation in the kitchen.  By the time that law enforcement began questioning him at his home, a reasonable person under Hoey's circumstances would not have felt "free to leave."

First, Hoey was in familiar surroundings, a factor which weighs against a custodial finding.  An interrogation in a defendant's residence "weighs against a finding of custody," but the level of physical control by police can "weigh heavily in the opposite direction." *U.S. v Mittel-Carey*, 493 F.3d 36, 40 (1st Cir. 2007).  Second, there were a large number of law enforcement officers present.  According to Agent Snow's testimony, 7-8 officers were present at the house, and 4-5 officers accompanied Hoey to the basement where he told them they could find the gun and narcotics in the locked safe.

Third, Hoey's freedom of movement was restricted.  Hoey was handcuffed during the drive from the traffic stop to the Residence, purportedly for officer safety.[4]  While he was

----

[4] Given that officers had just recovered 500 grams of cocaine and a loaded gun from Hoey's Audi and had informed him they had search warrants for his car and his home, where they had probable cause to suspect there would be additional contraband, it was not unreasonable for officers to handcuff Hoey to ensure their safety.  But the fact that Hoey was handcuffed, however briefly, must factor into the custody analysis.  *See U.S. v. Mittel-Carey*, 493 F.3d 36, 40 (1st Cir. 2007) (finding that even if physical control over defendant was necessary to preserve evidence

handcuffed in Agent Snow's car, he was told he was not under arrest, that he could stop talking to the agents at any time, and that they would allow Hoey to speak with an attorney if requested, implying that he could not use the telephone without their consent. They did not say he was free to leave when he asked about his rights.  He was unhandcuffed when he arrived at the Residence, but a lesser degree of physical restraint continued. The officers conducted the search in a "controlled environment" where they did not allow Hoey to make open doors or "dash into rooms," suggesting they did in fact restrict his movements and directed him only to areas of the house where he informed them they would find evidence.  Officers told him that if he wanted to contact a lawyer, they would facilitate the call,  Hoey asked about his rights a second time, and officer repeated the same answer: that he was not under arrest and could stop speaking to them or ask them to call him a lawyer at any time, but not that he was free to leave.

Fourth, the duration of the interrogation was significant.  Hoey's car was stopped at 9:00 or 9:15 am, he was handcuffed at about 10:00 am, transported a short distance to his home, then questioned there for three hours.  By the time Hoey finished answering questions at his residence, he had been with Agent Snow and the other officers for almost four hours.

Ordinarily, when a defendant is not handcuffed, advised that he is not under arrest, and told he is free to leave, there is no custodial interrogation when he is questioned in his own home.  *See U.S. v. McCarty*, 475 F.3d 39, 45-46 (1st Cir. 2007) (no custodial interrogation in defendant's apartment during search after defendant had been unhandcuffed, was questioned by two officers, and was told he was not under arrest, could leave at any time, and did not have to answer their questions); *contra Mittel-Carey* at 40 (questioning in defendant's home where eight

_____

and protect officer safety, the effect of that control on a reasonable person must be considered in a custodial interrogation analysis).

police officers arrived at 6:30 am, confronted the defendant with an unholstered gun in his dark bedroom, questioned him for 90 minutes to 2 hours, restricted his movements, accompanied him to the bathroom, and did not allow him to speak to his girlfriend alone constituted custodial interrogation).

Unlike *McCarty*, none of the officers here advised Hoey that he was free to leave.  Each time Hoey asked about his rights, Agent Snow repeated that Hoey was not under arrest but proceeded to deliver remarks that sound much like the *Miranda* warnings, which are only given when a suspect is formally arrested and their Fifth Amendment rights attach: Hoey had the right to remain silent (officers told him "he could stop speaking to them at any time"), and he had the right to an attorney (the agents told Hoey they would call an attorney if Hoey asked for one). Even if told they were not under arrest, a reasonable person in Hoey's situation would likely feel that they were not free to leave if the police had found a significant amount of controlled substances and three guns in their home and vehicle; had been handcuffed and driven away from their car in a police vehicle; were questioned for hours, and were administered incomplete *Miranda* warnings.

Based on Hoey's transportation in handcuffs, subsequent restraint during the search, the pervasive level of police presence, and the duration of the interrogation, I find that the Defendant's statements to law enforcement at his Residence should be suppressed.

2.  DEA Office Statements

At some point after the search of his home and after agents questioned him in his kitchen, Hoey's wife arrived and Hoey agreed to continue the interview at the DEA Office.

Unlike his trip from the road stop to his house, Hoey rode alone with Agent Snow and was not handcuffed.[5]  Upon arrival at the DEA Office, Hoey told the agents he "felt much more at ease" at the DEA station than he had been at his own home.  He was advised for a third time that he was free to stop speaking to agents at any time.  Unlike the prior instances, Agent Snow told Hoey that he was free to leave.  There was reduced police presence: Hoey was questioned by two officers, with a third intermittently present.  At some point, officers informed him that his wife had called to provide contact information for an attorney, and Sergeant Marollo stated Hoey was still speaking to the agents because he wanted to speak to them.  This was the fourth such statement to Hoey since he was driven away from the scene of the traffic stop earlier that day.  Hoey agreed, said that he understood that he was free to leave at any point, and declined to call the attorney.  The interview continued until officers decided Hoey had no more useful information to provide and asked him if he would like to call his attorney.  After Hoey called his attorney, the agents reentered the interview, where Hoey was formally arrested.

"Even when questioning occurs in the stationhouse, a suspect need not be given *Miranda* warnings if he went there voluntarily and there was no such restriction on his freedom as to render him in 'custody.'" *United States v. Quinn*, 815 F.2d 153, 160 (1st Cir. 1987).  There was no restraint on Hoey's movements at the DEA Office. He was told that he was free to leave or speak speaking to the agents.  The interview room door was not locked, and he could exit the DEA Office without a key or passcode.  Even if, as he claims, Hoey was put back in handcuffs for the drive from his residence to the DEA station, the fact that the handcuffs were removed and he was reminded twice at the station that he was not under arrest and could terminate the

---

[5] Hoey's Affidavit asserted that he was handcuffed during this trip, but Hoey did not testify at the suppression hearing and Agent Snow's testimony that Hoey was not handcuffed for this trip was credible.

questioning highlights the voluntary nature of his participation in the interview and shows that he was not in custody for the purposes of *Miranda*.

Hoey also argues that a reasonable person in his situation would have believed that, despite officers' repeated statements that he could leave and that he was not under arrest, they were not in fact free to leave at any point that day, including at the DEA Office, because the implied message conveyed was: "continue to speak to us, and we will go easy on you; lawyer up, and you will not receive any favorable treatment."  (Docket No. 50 at 22).  However, agents' unspecific statements that prosecutors might take his cooperation into account fall far short of the coercion needed to constitute custody in the absence of any other physical restraint on his movements. There is no evidence to rebut Agent Snow's testimony that agents made Hoey specific promises about his case.

Based on the facts presented, Hoey was not in custody during the DEA station interview, and his statements to the agents will not be suppressed.

### E.  Credit Union Forfeiture Warrant

Hoey also seeks to suppress the evidence related to the funds seized in his father's Leominster Credit Union account as fruit of the poisonous tree, on the grounds the forfeiture warrant was "obtained based upon the statements of the Defendant that are the subject of this motion to suppress."  (Docket No. 55 ¶ 4).  I have reviewed Agent Snow's Affidavit to ascertain its reliance Hoey's suppressed statements and find that suppressing this evidence is not warranted. (See generally Docket No. 62-1).  The statements about the volume of Hoey's trafficking and his total income from his three years of narcotics trafficking were made at the DEA Office. (See Docket No. 52-5 ¶ 11-12).  Since those statements have not been suppressed, the motion to suppress the evidence seized from the Credit Union account in Hoey's father's name is *denied*.

## Conclusion

For the reasons stated above, the Defendant's amended motion to suppress (Docket No. 55) is *denied in part and granted in part*.  The motion to suppress Defendant's statements to officers obtained during the search and interrogation at his Residence is *granted*; the motions to suppress the GPS Tracking Warrant, the Audi and Residence Search Warrants, and the Credit Union account Warrant, and the Defendant's statements at the DEA Office are *denied*.

**SO ORDERED.**

/s/ *Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**